**FOR PUBLICATION**

**UNITED STATES BANKRUPTCY COURT**

**EASTERN DISTRICT OF CALIFORNIA**

| | |
|---|---|
| In re: | Case No. 18-22453-A-7 |
| ECS REFINING, INC., | |
| Debtor. | |

| | |
|---|---|
| KIMBERLY J. HUSTED, | Adv. No. 20-02093-A |
| Plaintiff, | PH-2, DB-2 |
| v. | **MEMORANDUM** |
| KENNETH TAGGART et al., | |
| Defendants. | |

Argued and submitted on November 24, 2020

at Sacramento, California

Honorable Fredrick E. Clement, Bankruptcy Judge Presiding

Appearances:   Christopher D. Sullivan, Roxanne Bahadurji
and Quentin Roberts, Diamond McCarthy LLP
for Kimberly J. Husted, Chapter 7 trustee;
Howard M. Privette and Kay S. Kress,
Troutman Pepper Hamilton Sanders LLP for
Kenneth Taggart, James Taggart and Jack
Rockwood; Jamie P. Dreher and Joseph K.
Little, Downey Brand LLP for Sinclair
Partners LLC, ECS Big Town LLC, and All
Metals, Inc.

Directors of insolvent corporations owe fiduciary duties to creditors.  ECS Refining, Inc., was insolvent.  It owed SummitBridge a $26 million secured debt.  When SummitBridge refused to restructure its debt, ECS Refining's directors employed bare-knuckled and, in some instances self-interested, tactics designed to "take out" SummitBridge.  Caught in the crossfire, unsecured creditors' interests suffered.  After ECS Refining filed bankruptcy, the Chapter 7 trustee brought an action against the directors.  Has she stated a cause of action?

**I.    FACTS**

      **A.    The Preamble**

ECS Refining, Inc. ("ECS") is a Delaware corporation.  It conducted business in California, Oregon, Texas, Ohio, and Arkansas.  Founded in 1980, its primary business was the disposal and, in some cases, re-furbishing and re-selling of post-consumer electronic goods.  Prior to filing bankruptcy, it employed 325 people and had been quite profitable.

ECS was founded by Kenneth Taggart and James Taggart.  Collectively, the Taggarts were ECS's sole shareholders and constituted its board of directors.[1]  They also comprised the majority of ECS's officers.  James Taggart was its Chief Executive Officer and Kenneth Taggart was its Executive Vice President.  A third person, Jack Rockwood (collectively the "Individual Defendants"), served as its president.

---

[1] Though not germane here, between 2012 and early 2018, another private equity fund, ZS Fund L.P., owned a 50% interest in ECS and had "two individuals associated with the ZS Fund" on ECS's board of directors. First Am. Compl. 9:11-21.  By the date that ECS filed bankruptcy, the Taggarts were the sole shareholders and only members of the board of directors.  *Id.* at 9:23-24.

The Taggarts are the primary, if not exclusive, owners of--and control--three entities with whom ECS regularly did business: Sinclair Partners, LLC; ECS Big Town, LLC; and All Metals, Inc. (collectively the "Insider Entity Defendants").

The Insider Entity Defendants had long-term real property leases with ESC.  Sinclair Partners, LLC, leased 262,000 square feet, known as "the Stockton facility," to ECS under a 20-year lease.  Rent was $90,000 per month, subject to a 3.25% cost of living adjustment each year.  ECS Big Town, LLC, leased 216,000 square feet, known as "the Mesquite facility," to ECS under a 10-year lease.  Rent for that facility was $51,000 per month.  All Metals, Inc., also leased space to ECS.  Those facilities were larger than reasonably required for ECS's operations conducted at those sites.

Butch and Sundance, LLC, is a limited liability company. It was formed on the eve of ECS's bankruptcy and its only members are the Taggarts.  It was formed for the specific purpose of providing post-petition financing to ECS to be secured by receivables, inventory, cash and new equipment.

### B.  The SummitBridge Loans

In 2012, Bank of America made two loans to ECS: a $15 million revolving loan and a $35 million term loan.  Those loans were secured by ECS's equipment, inventory, goods, works in process, proceeds, fixtures, patents and trademarks and a pledge of stock in another company, Regenesys Glass Processing, LLC.[2]

In 2017, Bank of America sold its interest in the loans, and assigned its collateral securing those loans, to SummitBridge National

---

[2] The relationship of Regenesys Glass Processing, LLC, if any, to the Taggarts and/or ECS is unclear.

Investments V LLC ("SummitBridge"), a private equity firm.

About the same time, ECS wanted to restructure its long-term debt, now held by SummitBridge. To that end it retained MCA Financial Group, Ltd. ("MCA") and the law firm of Snell & Wilmer LLP ("Snell & Wilmer") to negotiate restructuring the SummitBridge loan. MCA and Snell & Wilmer did secure a forbearance agreement for ECS from SummitBridge through December 31, 2017.

However, as the forbearance agreement neared expiration, it became clear that the Taggarts and SummitBridge were at an impasse with respect to ECS's ultimate goal of long-term restructuring of SummitBridge's debt. The Taggarts insisted that they have control of ECS and at least 40% ownership each; SummitBridge was agreeable to further concessions but wanted further equity in ECS. Finding SummitBridge's demands unacceptable, the Taggarts, MCA and Snell & Wilmer developed a plan to "take out" Summit Bridge. But they needed time to identify and implement that strategy. So, from January through April 2018, Snell & Wilmer LLP and MCA engaged in "duplicitous negotiations" with SummitBridge without any intention of giving it additional equity in ECS while the Taggarts positioned ECS for bankruptcy.

### C. Preparing for ECS's Bankruptcy

While occupying SummitBridge with restructuring discussions, the Taggarts employed a tripartite strategy designed to subdue SummitBridge and to maximize Taggarts' control over ECS during and after the bankruptcy process. First, the Taggarts weakened ECS's overall financial health by minimizing ECS's cash position. Commercial rental payments to the Insider Entity Defendants were increased. For example, during the negotiations with SummitBridge the

Taggarts, acting through ECS Big Town, increased rent for the Mesquite facility from \$31,679 per month to \$51,332 per month. They also increased the rent for the Stockton facility by \$3,000 per month to \$112,583 per month. ECS also paid unnecessarily high salaries and wages to its employees. Trustee Husted complained that the Taggarts failed to address the "bloated overhead by adequately trimming the workforce" and made the "irrational decision to keep over" 325 full time employees. First Am. Compl. 13:15-17, ECF No. 28. ECS also paid vendors at rates greater than historical norms.

Second, the Taggarts undermined SummitBridge's position as a secured creditor. Trustee Husted described the Taggarts efforts as "a scheme to minimize ESC's assets that were subject to [its] security interest [in the days] leading up to the bankruptcy." *Id.* 12:18-20. As one of ECS's financial advisors described the strategy,

> *Well, the strategy...is a great way to put the screws to Summit by squeezing of as much of the [accounts receivable] as possible before filing. Summit is limited to collecting from and receiving proceeds from the [accounts receivable] at the time of filing ONLY.* That will include cash on hand at the time of filing. So that means once collected it should immediately be used to pay down critical expenses otherwise the money will need to be held FBO Summit.

*Id.* at 14:23-27 (emphasis added). This strategy involved collecting accounts receivable, spending available cash and ceasing production, and segregating incoming inventory. Because a large portion of SummitBridge's collateral for the loan was "inventory goods, works in progress, fixtures, and proceeds of the foregoing," stepping down the aggregate value of these assets increased its unsecured debt relative to its secured debt and marginalized its influence as a creditor.

**D.   Chapter 11**

After positioning itself, ECS filed Chapter 11 bankruptcy. ECS's counsel of choice in the Chapter 11 was Snell & Wilmer, as well as Ringstad & Sanders LLP.

At the time ECS sought bankruptcy protection, SummitBridge was owed $26.690 million.[3]  The collateral securing that debt had a value of $5 million.  *Id.*

Third, the Taggarts attempted to capitalize on their pre-bankruptcy strategies with a loan from their new-formed company Butch and Sundance, LLC.  Under the control of the Taggarts, ESC filed a first-day motion to authorize it to obtain post-petition financing from Butch and Sundance, LLC, of up to $6 million, granting it liens and superpriority administrative claims, and authorizing the use of cash collateral.  Emergency Ex Parte Mot. for Order Authorizing Post-Petition Financing 2:3-4:25, *In re ECS Refining, Inc.*, No. 2018-22453 (Bankr. E.D. Cal. April 24, 2018), ECF No. 12.  That motion represented:

> There is no dispute that, without substantial post-petition financing, the Debtor will be forced to immediately cease business operations and engage in a fire sale of its assets without the ability to maximize their value through its planned organization, which it plans to effectuate within the exclusivity period, if not sooner, and will benefit all creditors.

First Am. Compl. 20:6-9.

At the initial hearing of the motion there was "no disclosure that

---

[3] The court takes judicial notice of (1) the existence of Proof of Claim No. 327-2, *In re ECS Refining, Inc.*, No. 18-22453 (Bankr. E.D. Cal. November 16, 2018), filed by SummitBridge; and (2) the absence of objection to that proof of claim.  Fed. R. Evid. 201; *Burbank-Glendale-Pasadena Airport Auth. v. City of Burbank*, 136 F.3d 1360, 1364 (9th Cir. 1998) (court may take judicial notice of court filings).  Absent objection, the Proof of Claim is deemed allowed and presumptively valid.  11 U.S.C. § 502(a); Fed. R. Bankr. P. 3001(f).

Butch & Sundance LLC was purely self-funded and operated by the Taggarts." *Id.* 20:10-11.

The motion was supported by the unsigned declaration of ECS president, Jack Rockwood, who declared the terms were "fair, reasonable and adequate." *Id.* 20:17-19. But that is not true. For example, the proposed order approving the loan stated that the loan was "negotiated in good faith and at arm's length" between ECS and Butch and Sundance, LLC. Ex Parte Motion 32:9-10. Notwithstanding its claim of evenhandedness, Butch and Sundance, LLC, conditioned its willingness to make the loan on terms that were one-sided: (1) wavier of the trustee's surcharge rights, 11 U.S.C. § 506(c); freeing post-petition acquired property from any security interests granted to a pre-petition lender, i.e., SummitBridge, 11 U.S.C. § 552; (2) automatic stay relief on default; and (3) preclusion of any person from using post-petition loan proceeds to "investigate, assert, join, commence, support or prosecute any action" for "any avoidance action or other actions arising under Chapter 5 or Section 724(a)." *Id.* 39:18-40:5, 40:27-41:24, 42:4-19.

Under the terms of the proposed post-petition financing, in exchange for a loan of up to $ 6 million, Butch and Sundance LLC would receive a superpriority administrative expenses claim, 11 U.S.C. § 364(c); a first priority security interest against "any unencumbered pre-petition assets and all post-petition assets of the debtor"; a security interest "on any and [all] pre-petition assets, subject only to any existing as of the Petition Date, valid, perfected and unavoidable liens"; and a first priority security interest against "any and all claims arising under Chapter 5 of the Bankruptcy Code, including without limitation Sections 502(d), 544, 547, 548, 549, 550

and 553." *Id.* 2:28-4:6.

In response to ECS's motion, SummitBridge informed the court that the Taggarts were, in fact, the owners of Butch and Sundance, LLC.

**E.    Conversion to Chapter 7**

Six months after the Chapter 11 case was filed, the court ordered it converted to a case under Chapter 7.  Kimberly J. Husted ("Husted") was appointed as the trustee.

**II.   PROCEDURE**

Trustee Husted filed a complaint against the Individual Defendants and the Insider Entity Defendants.  Those defendants filed motions to dismiss the complaint and the trustee exercised her right to amend the complaint.  Fed. R. Civ. P. 15(a)(1)(B), *incorporated by* Fed. R. Bankr. P. 7015.

Plaintiff Husted's First Amended Complaint included 12 causes of action: breach of fiduciary duty; corporate waste; avoidance of preferences; avoidance of actual fraudulent transfers; avoidance of constructively fraudulent transfers; avoidance of unauthorized post-petition transfers; recovery of avoided transfers; equitable subordination; and objection to Proofs of Claim.

The Individual Defendants now move under Rule 12(b)(6) to dismiss the First Amended Complaint.  The Insider Entity Defendants now move under Rule 12(b)(6) to dismiss the First Amended Complaint or, in the alternative, under Rule 12(e) for a more definite statement. Plaintiff Husted opposes the motion.[4]

---

[4] The trustee does not oppose the motion as to (1) first and second causes of action: defendant Jack Rockwell; (2) the third cause of action: as to Sinclair Partners and ECS Big Town; (3) the sixth cause of action: all defendants; or (4) the eighth through twelfth causes of action: all defendants.  As a result, the motion will be granted without leave as to that defendant and those causes of action.

**III.  JURISDICTION**

This court has jurisdiction.  28 U.S.C. §§ 1334(a)-(b), 157(b); *see also* General Order No. 182 of the Eastern District of California. Because all parties have consented to entry of final orders and judgments, this court need not decide whether the matters presented are core or non-core.  28 U.S.C. § 157(b)(3); *Wellness Int'l Network, Ltd. v. Sharif*, 135 S.Ct. 1932, 1945-46 (2015); First Am. Compl. 7:21-22, ECF # 28; Mot. to Dismiss 5:16-17, August 19, 2020, ECF No. 41; Mem. P. & A. 9:8-10, August 19, 2020, ECF No. 50.

**IV.  LAW**

**A.  Rule 12(b)(6)**

Under Federal Rule of Civil Procedure 12(b)(6), a party may move to dismiss a complaint for "failure to state a claim upon which relief can be granted."  Fed. R. Civ. P. 12(b)(6), *incorporated by* Fed. R. Bankr. P. 7012(b).  "A Rule 12(b)(6) dismissal may be based on either a lack of a cognizable legal theory or the absence of sufficient facts alleged under a cognizable legal theory."  *Johnson v. Riverside Healthcare Sys.*, LP, 534 F.3d 1116, 1121–22 (9th Cir. 2008); *accord Navarro v. Block*, 250 F.3d 729, 732 (9th Cir. 2001).

"After *Iqbal* and *Twombly*, courts employ a three-step analysis in deciding Rule 12(b)(6) motions. At the outset, the court takes notice of the elements of the claim to be stated. *Eclectic Properties East, LLC v. Marcus & Millichap Co.*, 751 F.3d 990, 997 (9th Cir. 2014). Next, the court discards conclusions. *Ashcroft v. Iqbal*, 556 U.S. 662, 679 (2009); *United States ex rel. Harper v. Muskingum Watershed Conservancy District*, 842 F.3d 430, 438 (6th Cir. 2016) (the complaint failed to include "facts that show how" the defendant would have known alleged facts). Finally, assuming the truth of the remaining well-

pleaded facts, and drawing all reasonable inferences therefrom, the court determines whether the allegations in the complaint "plausibly give rise to an entitlement to relief." *Iqbal*, 556 U.S. at 679; *Sanchez v. United States Dept. of Energy*, 870 F.3d 1185, 1199 (10th Cir. 2017). *See generally*, *Wagstaff Practice Guide: Federal Civil Procedure Before Trial*, Attacking the Pleadings, Motions to Dismiss § 23.75-23.77 (Matthew Bender & Company, Inc. 2019)." *Aluisi v. Jorgensen (In re Jorgensen)*, No. 19-01026, 2019 WL 6720418, at *4 (Bankr. E.D. Cal. Dec. 10, 2019)

"Plausibility means that the plaintiff's entitlement to relief is more than possible. *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 556, 570 (2007) (the facts pled "must cross the line from conceivable to plausible"); *Almanza v. United Airlines, Inc.*, 851 F.3d 1060, 1074 (11 Cir. 2017). Allegations that are "merely consistent" with liability are insufficient. *Iqbal*, 556 U.S. at 662; *McCauley v. City of Chicago*, 671 F.3d 611, 616 (7th Cir. 2011)." *Aluisi v. Jorgensen*, 2019 WL 6720418, at *4.

"If the facts give rise to two competing inferences, one of which supports liability and the other of which does not, the plaintiff will be deemed to have stated a plausible claim within the meaning of *Iqbal* and *Twombly*. *Houck v. Substitute Tr. Servs., Inc.*, 791 F.3d 473, 484 (4th Cir. 2015); *16630 Southfield Ltd. P'hsip v. Flagstar Bank, F.S.B.*, 727 F.3d 502, 505 (6th Cir. 2013); *see also*, *Wagstaff*, Motion to Dismiss at § 23.95. But if one of the competing inferences is sufficiently strong as to constitute an "obvious alternative explanation," that inference defeats a finding of plausibility and the complaint should be dismissed. *Marcus & Millichap Co.*, 751 F.3d at 996 ("Plaintiff's complaint may be dismissed only when defendant's

plausible alternative explanation is so convincing that the plaintiff's explanation is implausible."); *New Jersey Carpenters Health Fund v. Royal Bank of Scotland Group, PLC*, 709 F.3d 109, 121 (2nd Cir. 2013)." Aluisi v. Jorgensen, 2019 WL 6720418, at *4.

In addition to looking at the facts alleged in the complaint, the court may also consider some limited materials without converting the motion to dismiss into a motion for summary judgment under Rule 56. Such materials include (1) documents attached to the complaint as exhibits, (2) documents incorporated by reference in the complaint, and (3) matters properly subject to judicial notice. *United States v. Ritchie*, 342 F.3d 903, 908 (9th Cir. 2003); *accord Swartz v. KPMG LLP*, 476 F.3d 756, 763 (9th Cir. 2007) (per curium) (citing *Jacobson v. Schwarzenegger*, 357 F.Supp.2d 1198, 1204 (C.D. Cal. 2004)). A document may be incorporated by reference, moreover, if the complaint makes extensive reference to the document or relies on the document as the basis of a claim. *Ritchie*, 342 F.3d at 908.

**B.    Rule 12(e)**

Under Federal Rule of Civil Procedure 12(e), a party may move to dismiss a complaint "for a more definite statement." Fed. R. Civ. P. 12(e), *incorporated by* Fed. R. Bankr. P. 7012(b). Rule 12(e) is proper where the complaint is sufficiently conclusory, confused or unclear that a defendant cannot properly be expected to respond. *Balderrama v. Pride Indus., Inc.*, 963 F.Supp.2d 646, 667 (W.D. TX 2013).

**C.    Internal Affairs Doctrine**

"A federal court sitting in diversity must look to the forum state's choice of law rules to determine the controlling substantive law." *Mazza v. Am. Honda Motor Co.*, 666 F.3d 581, 589 (9th Cir. 2012)

(quoting *Zinser v. Accufix Research Inst., Inc.*, 253 F.3d 1180, 1187 (9th Cir. 2001), *opinion amended on denial of reh'g*, 273 F.3d 1266 (9th Cir. 2001).  The internal affairs doctrine is a conflict of law principle that "recognizes that only one State should have the authority to regulate a corporation's internal affairs--matters peculiar to the relationships among or between the corporation and its current officer, directors, and shareholders--because otherwise a corporation could be faced with conflicting demands." *Edgar v. MITE Corp.*, 457 U.S. 624, 645 (1982); *Drulias v. 1st Century Bancshares, Inc.*, 30 Cal.App.5th 696, 705 (2018); *Greb v. Diamond Int'l Corp.*, 56 Cal.4th 243, 264-269 & fn. 35 (2013).

Well aware of the conundrum articulated by *Edgar*, California has codified the internal affairs doctrine.

> The directors of a foreign corporation transacting intrastate business are liable to the corporation, its shareholders, creditors, receiver, liquidator or trustee in bankruptcy for the making of unauthorized dividends, purchase of shares or distribution of assets or false certificates, reports or public notices or other violation of official duty according to any applicable laws of the state or place of incorporation or organization, whether committed or done in this state or elsewhere. Such liability may be enforced in the courts of this state.

Cal. Corp. Code § 2116.

California's treatment of the issue is consistent with the Restatement (Second) of Conflicts of Laws treatment of the problem.

> The local law of the state of incorporation will be applied to determine the existence and extent of a director's or officer's liability to the corporation, its creditors and shareholders, except where, with respect to the particular issue, some other state has a more significant relationship under the principles stated in § 6 to the parties and the transaction, in which event the local law of the other state will be applied.

*Restatement (Second) of Conflict of Laws* § 309 (1971), cited with

approval by *Edgar*, 457 U.S. at 645.

The outermost reach of the internal affairs doctrine is not well defined. But as applied to directors and corporate officers the doctrine applies to acts "which closely affect the organic structure or internal administration of the corporation," as opposed to acts that can "practicably be decided differently in different states," such as "causing the making of a contract or the commission of a tort." Rest.2d § 309, Comment (c).

Exceptions to the rule exist where a state other than the state of incorporation has "a more significant relationship" to the parties and the transaction, Rest.2d § 309, Cal. Corp. Code § 2115;[5] *Lidow v. Superior Court (International Rectifier Corp.)*, 206 Cal.App.4th 351, 359 (2012) (recognizing the common law "more significant relationship" exception); *Vaughn v. LJ Int'l, Inc.*, 174 Cal.App.4th 213, 225-226 (2009) or where the interests of justice so require. Rest.2d § 302 et

---

[5] California Corporations Code § 2115 provides a statutory exception to the "internal affairs doctrine." In the pertinent part it provides:

> (a) A foreign corporation (other than a foreign association or foreign nonprofit corporation but including a foreign parent corporation even though it does not itself transact intrastate business) is subject to the requirements of subdivision (b) commencing on the date specified in subdivision (d) and continuing until the date specified in subdivision (e) if:
> (1) The average of the property factor, the payroll factor, and the sales factor (as defined in Sections 25129, 25132, and 25134 of the Revenue and Taxation Code) with respect to it is more than 50 percent during its latest full income year and
> (2) more than one-half of its outstanding voting securities are held of record by persons having addresses in this state appearing on the books of the corporation on the record date for the latest meeting of shareholders held during its latest full income year or, if no meeting was held during that year, on the last day of the latest full income year....

seq.; *Gillis v. Pan Amer. Western Petroleum Co.*, 3 Cal.2d 249, 252 (1935).

**V.  DISCUSSION**

The effect of Taggarts' actions was to restrict SummitBridge's collateral to the $5 million of collateral it held on the date ECS filed for bankruptcy protection and to relegate the remainder of the debt, i.e., $21.690 million, to that of unsecured debt.  11 U.S.C. §§ 506(a), (d), 552(a) ("[P]roperty acquired by the estate or by the debtor after the commencement of the case is not subject to any lien resulting from any security agreement entered into by the debtor before the commencement of the case"); Emergency Ex Parte Mot. for Order Authorizing Post-Petition Financing 2:28-4:6, *In re ECS Refining, Inc.*, No. 2018-22453 (Bankr. E.D. Cal. April 24, 2018), ECF No. 12 (interposing an intervening lien).

These allegations give rise to the inference that the Taggarts intended to use plan confirmation to force SummitBridge to restructure its debt.  Bifurcating SummitBridge's claim positioned ECS for confirmation fight with SummitBridge by: (1) reducing the amount that must be paid under the best interests test, i.e., $5 million, 11 U.S.C. § 1129(a)(7)(A)(ii); (2) denying SummitBridge an absolute priority rule objection as to its secured claim by proposing a plan that called for the sale of SummitBridge's now diminished collateral, 11 U.S.C. §§ 1129(b)(1),(2)(A)(ii) (which overrides a 11 U.S.C. § 1111(b) election), 1111(b)(1)(B)(ii)); *Cf. RadLAX Gateway Hotel, LLC v. Amalgamated Bank*, 566 U.S. 639 (2012) (construing 11 U.S.C. § 1129(b)(2)(A)(iii)); 7 *Collier on Bankruptcy* ¶ 1111.03[5][c] (Alan N. Resnick & Henry J. Sommer eds., 16th ed. 2020); and (3) minimizing any argument that the absolute priority rule is violated as to unsecured

creditors by reducing the amount of the "new value" contribution

necessary to overcome that objection.  11 U.S.C. § 1129(b)(2)(B); *In re Bonner Mall Partnership*, 2 F.3d 899, 906 (9th Cir. 1993), *abrogated on other grounds by Bullard v. Blue Hills Bank*, 575 U.S. 496 (2105).

But neither federal, nor state, i.e., Delaware, law authorizes the trustee to act solely on behalf of an individual creditor, i.e., SummitBridge.  *Caplin v. Marine Midland Grace Trust Co. of New York*, 406 U.S. 416 (1972) (a bankruptcy trustee may not pursue a claim for injury solely to benefit one creditor or one class of creditors); *Williams v. Cal. 1st Bank*, 859 F.2d 664, 666 (9th Cir. 1988); *Mixon v. Anderson (In re Ozark Rest. Equip. Co.)*, 816 F.2d 1222, 1227-28 (8th Cir. 1987); *N. Am. Catholic Educ. Programming Found., Inc. v. Gheewalla*, 930 A.2d 92, 99 (Del. 2007) (creditors do not hold a direct right of action against directors for breach of a fiduciary duty); *Nemec v. Shrader*, 991 A.2d 1120, 1129 (Del. 2010).[6]

The question is whether the Taggarts' actions, which were aimed at SummitBridge, incidentally and unlawfully injured ECS's unsecured creditors.

**A.   First Cause of Action: Breach of Fiduciary Duties**

Plaintiff Husted alleges that defendants Taggarts' actions breached their fiduciary duties of loyalty, care and good faith.

**1.   Choice of Law: Delaware or California**

*Edgar* and California Corporations Code § 2116 specifically contemplate the breed of cat now before this court.  Section 2116

---

[6] Because *Caplin v. Marine Midland Grace Trust Co. of New York*, 406 U.S. 416 (1972), precludes the trustee from acting on behalf of but a single creditor the Individual Defendants' motion to dismiss the First Amended Complaint will be granted without leave to amend insofar as the trustee seeks to recover for injuries unique to SummitBridge.

applies to a director's liability to "the corporation, its
shareholders, creditors, receiver, liquidator or trustee in
bankruptcy."  By the same measure it applies to directors' actions
"for the making of unauthorized dividends, purchase of shares or
distribution of assets or false certificates, reports or public
notices or other violation of official duty."  Efforts by the board of
directors to restructure debt or to posture the corporation for
reorganization in Chapter 11 are "official duties" within the meaning
of § 2116.  The Chapter 7 trustee contends the directors Taggarts'
actions were overly zealous or self-interested.

Moreover, California and federal courts have had little
difficulty finding a breach of fiduciary duty that affects the organic
structure of the corporation and, as a result, that Delaware law
provides the rule of decision.  *Vaughn v. LJ Int'l, Inc.*, 174
Cal.App.4th 213, 223-25 n. 5 (2009) (apply internal affairs doctrine
to breach of fiduciary duty); *Banjo Buddies, Inc. v. Renosky*, 399 F.3d
168, 179 n. 10 (3rd Cir. 2005); *Gabriel v. Preble*, 396 F.3d 10, 13
(1st Cir.2005); *Hollis v. Hill*, 232 F.3d 460, 465-66 (5th Cir. 2000);
*Nagy v. Riblet Products Corp.*, 79 F.3d 572, 576 (7th Cir. 1996);
*Hausman v. Buckley*, 299 F.2d 696, 703 (2d Cir.1962) ("the internal
affairs rule has been applied repeatedly in order to determine the
fiduciary duty of a foreign corporation's directors").

Plaintiff Husted argues that California has a more significant
relationship to the parties and the transaction than Delaware has to
the parties and the transaction.  Rest.2d § 309.  If *Edgar*, and its
progeny, admit such an exception, *VantagePoint Venture Partners 1996*
*v. Examen, Inc.*, 871 A.2d 1108, 1115-1118 (Del. 2005) (holding
California Corp. Code § 2115, the codification of the more significant

relationship exception, unconstitutional), this is not it.  The laws

of the state of incorporation presumptively provide the rule of

decision and it is the "unusual case' where the forum state has a more

significant relationship to the parties and the occurrence." *Mukamal*

*v. Bakes*, 378 Fed.Appx. 890, 897 (11th Cir. April 30, 2010).  In

determining whether the forum state has a more significant

relationship to the parties and the transaction, the court should

consider:

> (a) the needs of the interstate and international systems,
> (b) the relevant policies of the forum, (c) the relevant
> policies of other interested states and the relative
> interests of those states in the determination of the
> particular issue,(d) the protection of justified
> expectations, (e) the basic policies underlying the
> particular field of law, (f) certainty, predictability and
> uniformity of result, and (g) ease in the determination and
> application of the law to be applied.

Restatement (Second) Conflicts of Laws § 6 (1971).

The trustee attempts to characterize this dispute as one that is

rooted deeply, perhaps even exclusively, in California.  But that is

not true.  As the trustee herself characterizes ECS's operations it

conducted business in five states and employees 325 persons.  Its

creditors come from throughout the United States and themselves have

national presences.  Under the guidance of a national law firm, Snell

& Wilmer, the Taggarts employed a companywide strategy to take over

ECS.  The strategy involved keeping SummitBridge talking about

restructuring its debt while the Taggarts prepared for ECS's

bankruptcy; weakening ECS companywide by reducing cash, work in

progress, and accounts receivable; and undermining SummitBridge's

position as a secured creditor by using its collateral without

replacing it.  After placing ECS in peril, Taggarts, acting through

their wholly-owned entity, Butch and Sundance, LLC, purported to

rescue ECS with a post-petition loan which falsely purported to be on terms that were "fair, reasonable and adequate."  Adding insult to injury neither ECS, nor Taggarts, initially disclosed their ownership in that entity.  The simple point is that California's tie to this case is far weaker than the trustee believes, and that fragile connection weighs heavily in favor of the rule, i.e., application of Delaware law, and against application of California law.

Moreover, justified expectations also suggest application of the rule, and not the exception.  Taggarts certainly expected, even bargained for, application of Delaware law.  Sophisticated creditors (who now speak through trustee Husted) contemplating business with ECS are fairly charged with knowledge of the law, including the internal affairs doctrine, and must have expected application of well-trenched choice of law rules against them.

Finally, certainty, predictability and uniformity of result weigh in favor of the application of Delaware law.  ECS had a presence in five states: California, Oregon, Texas, Ohio and Arkansas.  Its Chapter 11 petition might well have been proper in any of those venues.  28 U.S.C. § 1408.  Literal application of the internal affairs doctrine will produce certainty and uniformity in the choice of law analysis.  Deviating from it undercuts uniformity and certainty with respect to the standard by which the Individual Defendants' actions would be judged.

For these reasons, the court believes that Delaware, and not California, law controls.

### 2.    Corporate directors and their duties

Delaware law imposes fiduciary duties on corporate directors.  1 R. Frank Balotti & Jesse A. Finkelstein, *Delaware Law of Corporations*

*and Business Organizations* § 4.14 (3rd ed. 2020-2 Supplement). As a rule, that duty requires directors to exercise due care and loyalty toward the corporation and its shareholders. *Mills Acquisition Co. v. Macmillan*, Inc., 559 A.2d 1261, 1280 (Del. 1989); Balotti & Finkelstein, *supra*, at § 4.14.[7]

Directors must exercise due care, both in decision making by acting on an informed basis and in "other aspects of their responsibilities." Balotti & Finkelstein, *supra*, at § 4.15. As a rule, in managing corporate affairs directors of a corporation must exercise "that amount of care which ordinarily careful and prudent men would use in similar circumstances." *Graham v. Allis-Chambers Mfg. Co.*, 188 A.2d 125, 130 (1963). But as applied to decision-making, Delaware courts have applied a gross negligence standard. *Stone v. Ritter*, 911 A.2d 362, 369 (Del. 2006); *Brehm v. Eisner*, 746 A.2d 244, 259 (Del. 2000); *Aronson v. Lewis*, 473 A.2d 805, 812 (Del. 1984). As used in this context gross negligence means a "reckless indifference to or a deliberate disregard of the whole body of stockholders or actions which are without the bounds of reason." *Tomczak v. Morton Thiokol, Inc.*, No. 7861, 1990 WL 42607, at *12 (Del. Ch. Apr. 5, 1990).

As one source summarized that duty:

> Judicial inquiry into whether directors have exercised "due care" in the decision-making context (citation omitted) involves an examination of whether the directors informed themselves, before "making a business decision, of all material information reasonably available to them." The directors' judgment must be "informed . . ., with the inquiry directed to the material or advice the board had

---

[7] Good faith is not a separate subspecies of fiduciary duty but is a subsidiary element of the duty of loyalty. *Stone v. Ritter*, 911 A.2d 362, 369-70 (Del. 2006); Balotti & Finkelstein, *supra*, at § 4.14 fn. 624.

available to it and whether it had sufficient opportunity
to acquire knowledge concerning the problem before acting.

Balotti & Finkelstein, *supra*, at § 4.15.

Directors also act with loyalty toward the corporation in their management of corporate affairs and personal dealings with the corporation. *Id.* at § 4.16 (describing it as a "companion obligation to the duty of care"). This duty arises from the premise that "the directors are duty-bound to the true owners of the corporation, the stockholders." *Id.* That duty precludes a director from "stand[ing] on both sides" of a transaction and from obtaining "any personal benefit through self-dealing." *Andarko Petroleum Corp. v. Panhandle E. Corp.*, 545 A.2d 1171, 1174 (Del. 1988); *QC Commc'ns, Inc. v. Quartone*, No. 8218-VCG, 2014 WL 3974525, at *11 (Del. Ch. Aug. 15, 2014); *Pers. Touch Holding Corp. v. Glaubach*, No. 11199-CB, 2019 WL 937180, at *19 (Del. Ch. Feb. 25, 2019) ("[I]n a typical self-dealing transaction, the fiduciary is the recipient of an allegedly improper personal benefit, which usually comes in the form of obtaining something of value or eliminating a liability."); Balotti & Finkelstein, *supra*, at § 4.16. The standard is not a subjective one. *See AC Acquisitions Corp. v. Anderson, Clayton & Co.*, 519 A.2d 103, 114-15 (Del. Ch. 1986).

As the same commentator described the duty:

In effect, it mandates that a director not consider or represent interests other than the best interests of the corporation and its stockholders in making a business decision. The duty of loyalty also "encompasses cases where the fiduciary fails to act in good faith," including the duty of oversight.

*Balotti & Finkelstein, supra, at § 4.16* at fn. 747, citing *Revlon, Inc. v. MacAndrews & Forbes Holdings, Inc.*, 506 A.2d 173, 182 (Del.

1986); *Weinberger v. UOP, Inc.*, 457 A.2d 701, 710 (Del. 1983); *Guth v. Loft, Inc.*, 5 A.2d 503, 510 (Del. 1939) ("The rule that requires an undivided and unselfish loyalty to the corporation demands that there shall be no conflict between duty and self-interest."); *In re infoUSA, Inc. S'holders Litig.*, 953 A.2d 963, 996 (Del. Ch. 2007) ("If defendants actually engaged in this form of wasteful legerdemain in order to help [the Chief Executive Officer] acquire the company at an inequitable price, it constitutes a violation of their fiduciary duty of loyalty, even if it did not succeed.").

That same commentator stated:

> While the general concept underlying the duty of loyalty--
> that a director refrain from self-dealing--is simple,
> application of the loyalty principle can be difficult,
> especially in complex transactions involving corporate
> control. In such circumstances, this application can become
> a highly fact-intensive exercise. This is in part because,
> in those circumstances, *the courts interpret the duty of
> loyalty as involving not only a duty to refrain from self-
> dealing but also a duty to deal "fairly" with the
> stockholders when directors have an interest in the
> transaction.* As the Delaware Supreme Court stated . . .
> '[w]hen directors of a Delaware corporation are on both
> sides of a transaction, they are required to demonstrate
> their utmost good faith and the most scrupulous inherent
> fairness of the bargain.'

Balotti & Finkelstein, *supra*, at § 4.16 (emphasis added).

A corollary to the duties of care and loyalty is the duty of disclosure. Balotti & Finkelstein, *supra*, at § 4.18 ("The duty of disclosure--also known as the duty of candor--is not really a separate fiduciary duty; it stems from the fiduciary duties of due care and loyalty"). When shareholders ask for corporate action, they must disclose any and all material information requested and must provide "a balanced, truthful account of all matters disclosed in the communications with shareholders." *Id.*, citing *Malone v. Brincat*, 722 A.2d 5, 12 (Del. 1998); *see also Shell Petroleum, Inc. v. Smith*, 606

A.2d 112, 114 (Del. 1992); *Stroud v. Milliken Enters.*, Inc., 552 A.2d

476, 480 (Del. 1989); *Lynch v. Vickers Energy Corp.*, 383 A.2d 278,

279, 281 (Del. 1978).  Materiality is determined by whether there is a

substantial likelihood that it would affect the shareholders'

decision.

> The Delaware courts use the same materiality standard used
> by the U.S. Supreme Court: "An omitted fact is material if
> there is a substantial likelihood that a reasonable
> shareholder would consider it important in deciding how to
> vote." That is, directors are only required to disclose
> facts that significantly alter the "total mix" of
> information available to the stockholder.

Balotti & Finkelstein, *supra*, at § 4.18.

Even in instances where shareholder action is not sought, if

directors "knowingly disseminate false information that results in

corporate injury or damage to an individual shareholder," the

directors have breached their fiduciary duty. *Malone v. Brincat*, 722

A.2d 5, 9 (Del. 1998).  "When the directors are not seeking

shareholder action, but are deliberately misinforming shareholders

about the business of the corporation, either directly or by a public

statement, there is a violation of fiduciary duty." Balotti &

Finkelstein, *supra*, at § 4.18.

A director's fiduciary duty is limited by the "business judgment

rule." Balotti & Finkelstein, *supra*, at § 4.19.  The business

judgment rule is a "presumption that in making a business decision the

directors of a corporation acted on an informed basis, in good faith

and in the honest belief that the action taken is in the best

interests of the company." *Id*. at § 4.19 fn. 1090, citing *Aronson v.

Lewis*, 473 A.2d 805, 812 (Del. 1984); *see also Citron v. Fairchild

Camera & Instrument Corp.*, 569 A.2d 53, 64 (Del. 1989) ("The

presumption initially attaches to a director-approved transaction

22

within a board's conferred or apparent authority in the absence of any evidence of fraud, bad faith, or self-dealing in the usual sense of personal profit or betterment."); *John Hancock Capital Growth Mgmt. Inc. v. Aris Corp.*, 9920, 1990 WL 126656, at *1 (Del. Ch. Aug. 24, 1990). When applicable, the business decisions of the board of directors "will not be disturbed if they can be attributed to any rational business purpose. A court under such circumstances will not substitute its own notions of what is or is not sound business judgment." Balotti & Finkelstein, *supra*, § 4.19 fn. 1091, citing *Sinclair Oil Corp. v. Levien*, 280 A.2d 717, 720 (Del. 1971); *see also Brazen v. Bell Atl. Corp.*, 695 A.2d 43, 49 (Del. 1997) ("Courts give deference to directors' decisions reached by a proper process, and do not apply an objective reasonableness test in such a case to examine the wisdom of the decision itself.").

The Delaware Court of Chancery described the business judgment rule as having three elements: "a threshold review of the objective financial interests of the board whose decision is under attack (i.e., independence), a review of the board's subjective motivation (i.e., good faith), and an objective review of the process by which it reached the decision under review (i.e., due care)." *Delaware Law of Corporations*, Fiduciary Duties § 4.19 fn. 1091, citing *In re RJR Nabisco, Inc. S'holders Litig.*, No. 10389, 1989 WL 7036, at *1156 (Del. Ch. Jan. 31, 1989).

The business judgment rule operates as a "procedural guide" and "a substantive rule of law." *Citron v. Fairchild Camera & Instrument Corp.*, 569 A.2d 53, 64 (Del. 1989). Among its procedural aspects is the presumption that the directors have acted properly, placing the burden of proof on the plaintiff. "The burden falls upon the

proponent of a claim to rebut the presumption by introducing evidence either of director self-interest, if not self-dealing, or that the directors either lacked good faith or failed to exercise due care." *Id.*

Finally, only limited persons have standing to prosecute a claim for breach of fiduciary duty against a corporate director. Ordinarily, those rights belong exclusively to the corporation and its shareholders. *Guth v. Loft*, 5 A.2d 503, 510 (Del.1939); *Malone v. Brincat*, 722 A.2d 5, 10 (Del.1998). Shareholders may act only derivatively. As the Supreme Court of Delaware explained:

> It is well established that the directors owe their fiduciary obligations to the corporation and its shareholders. While shareholders rely on directors acting as fiduciaries to protect their interests, creditors are afforded protection through contractual agreements, fraud and fraudulent conveyance law, implied covenants of good faith and fair dealing, bankruptcy law, general commercial law and other sources of creditor rights. Delaware courts have traditionally been reluctant to expand existing fiduciary duties. Accordingly, "the general rule is that directors do not owe creditors duties beyond the relevant contractual terms."

*N. Am. Catholic Educ. Programming Found., Inc. v. Gheewalla*, 930 A.2d 92, 99 (Del. 2007). As a consequence, the directors of solvent corporations are wholly protected against actions, direct or indirect, by aggrieved creditors.

Corporations that are not yet insolvent but are in financial jeopardy are referred to as "within the zone of insolvency." Like solvent corporations, creditors hold no right of action for breach of fiduciary duties against directors for corporations operating within the zone of insolvency. *Id.; Quadrant Structured Products Co., Ltd. v. Vertin*, 115 A.3d 535, 546 (Del. Ch. 2015).

By contrast, the creditors of "insolvent" corporations do hold a

derivative action against the corporation and, by extension, its

directors, under the "so-called trust fund doctrine." Balotti &

Finkelstein, *supra*, at § 5.2. Insolvency is measured on the date the

action is filed, *Quadrant Structured Products*, 115 A.3d at 543-556,

and will be adjudged by the balance sheet test ("deficiency of assets

below liabilities"), *Gheewalla*, 930 A.2d at 98, citing *Production Res.*

*Group v. NCT Group, Inc.*, 863 A.2d 772, 782 (Del.Ch. 2004); *Geyer v.*

*Ingersoll Publ'ns Co.*, 621 A.2d 784, 789 (Del.Ch. 1992); *McDonald v.*

*Williams*, 174 U.S. 397, 403 (1899), or by the cash flow test ("an

inability to meet maturing obligations as they fall due in the

ordinary course of business"). *Gheewalla*, 930 A.2d at 98, citing

*Production Res. Group v. NCT Group, Inc.*, 863 A.2d 772, 782 (Del. Ch.

2004).

A creditor's right to pursue an action against directors is best

described by the Delaware Supreme Court:

> When a corporation is solvent, those duties may be enforced
> by its shareholders, who have standing to bring derivative
> actions on behalf of the corporation because they are the
> ultimate beneficiaries of the corporation's growth and
> increased value. *When a corporation is insolvent, however,*
> *its creditors take the place of the shareholders as the*
> *residual beneficiaries of any increase in value.*
>
> Consequently, the creditors of an insolvent corporation
> have standing to maintain derivative claims against
> directors on behalf of the corporation for breaches of
> fiduciary duties. The corporation's insolvency makes the
> creditors the principal constituency injured by any
> fiduciary breaches that diminish the firm's value.
> *Therefore, equitable considerations give creditors standing*
> *to pursue derivative claims against the directors of an*
> *insolvent corporation. Individual creditors of an insolvent*
> *corporation have the same incentive to pursue valid*
> *derivative claims on its behalf that shareholders have when*
> *the corporation is solvent.*

*Gheewalla*, 930 A.2d at 98 (emphasis added); *see also Quadrant*

*Structured Products*, 115 A.3d at 546-47 ("[Directors] continue to owe

fiduciary duties to the corporation for the benefit of all of its residual claimants, a category which now includes creditors.").

### 3. Plausibility

As applied here, plausibility requires trustee Husted to make a three-part factual showing: standing, i.e., that ECS was insolvent at the time the adversary proceeding was commenced; inapplicability of the business judgment rule, i.e., fraud, bad faith or self-dealing; and breach of fiduciary duty. She has done so.

Plaintiff Husted has standing to assert derivative claims for breach of fiduciary duties. As of the date of Husted's adversary proceeding ECS was a Chapter 7 debtor and was not paying its bills in the ordinary course. *Geyer v. Ingersoll Publication Co.*, 621 A.2d 784 789 (Del. Ch. 1991) (cash flow test); 11 U.S.C. §§ 704(a)(9), 726; Fed. R. Bankr. P. 5009(a) (contemplating distribution after full administration of the case). Moreover, courts have long recognized the authority of Chapter 7 trustees to assert derivative claims for breach of fiduciary duty against members of the board of directors of a corporate debtor. *Bovay v. H.M. Byllesby & Co.*, 38 A.2d 808 (Del. 1944); *Trenwick Am. Litig. Trust v. Ernst & Young, L.L.P.*, 906 A.2d 168, 189 (Del. Ch. 2011) (litigation trust); *In re USDigital, Inc.*, 443 B.R. 22, 43 (Bankr. D. Del. 2011) (Chapter 7 trustee); *In re Scott Acquisition Corp.*, 344 B.R. 283, 290 (Bankr. D. Del. 2006). As a result, Husted has standing to pursue this claim.

The business judgment rule does not bar this action. While that rule assumes appropriate conduct by the board of directors, that presumption may be rebutted by pleading facts that show self-interest, self-dealing, lack of good faith or the failure of due care. *Citron v. Fairchild Camera & Instrument Corp.*, 569 A.2d 53, 64 (Del. 1989).

Here, the trustee has plead facts from which the inference of self-dealing or the lack of good faith might be inferred. Those facts include: increased rental payments to the Insider Entity Defendants; the cessation of operations to reduce cash flow and receivables, an expressed desire to "put the screws to Summit[Bridge]"; and the failure to disclose to creditors the Taggarts' ownership of Butch and Sundance, LLC, the proposed post-petition lender. As a result, the trustee has plead around the business judgment rule.

Finally, plaintiff Husted has plead plausible claims for breach of the duty of care and of loyalty. Fed R. Civ. P. 10(b) (allowing aggregating theories in a single count), *incorporated by* Fed. Bankr. P. 7010.

Husted's first theory is that Taggarts engaged in bad faith acts that deepened ECS's insolvency. Delaware law does not recognize "an independent cause of action for deepening insolvency." *Trenwick Am. Litig. Trust v. Ernst & Young, L.L.P.*, 906 A.2d 168, 205 (2006); *Quadrant Structured Products Co., Ltd.*, 115 A.3d at 547 ("Directors cannot be held liable for continuing to operate an insolvent entity in the good faith belief that they may achieve profitability..."). But Delaware does require that a director's actions be undertaken in "good faith." *Id.* A court may infer the lack of good faith where a director "intentionally acts with a purpose other than advancing the best interests of the corporation." *In re Walt Disney Co. Derivative Litig.*, 906 A.2d 27, 67 (Del. 2006). Moreover, *Trenwick* specifically reserved to the corporation--and by extension, creditors--breach of fiduciary duty claims where the board of directors acted in a way that made the corporation's situation more dire:

The rejection of an independent cause of action for

27

> deepening insolvency does not absolve directors of
> insolvent corporations of responsibility. Rather, it remits
> plaintiffs to the contents of their traditional toolkit,
> which contains, among other things, causes of action for
> breach of fiduciary duty and for fraud.

*Trenwick*, 906 A.2d at 205.

Here, the plaintiff has plead facts from which a plausible claim for breach of the fiduciary duty of due care that resulted in ECS's still deeper insolvency. Decisions by the board of directors are reviewed under a "gross negligence" standard. *Stone v. Ritter,* 911 A.2d 362, 369 (Del. 2006); *Brehm v. Eisner*, 746 A.2d 244, 259 (Del. 2000). Gross negligence means "reckless indifference to or a deliberate disregard of the whole body of stockholders [here, creditors] or actions that are without of the bounds of reason." *Tomczak v. Morton Thiokol*, No. 7861, 1990 WL 42607, at *12 (Del. Ch. April 5, 1990). The Taggarts deliberately weakened ECS's financial condition to force concessions from SummitBridge. Two inferences are possible. One inference is that the Taggarts' actions designed to tame an unruly secured creditor were, in fact, in the best interests of unsecured creditors. The other inference was the weakening strategy is employed without due consideration of its impact on unsecured creditors. Given the use of a counterintuitive strategy, i.e., weakening an already frail corporation, and self-dealing, *Trenwick Am. Litig. Trust*, 906 A.2d at 205 (requiring good faith in the exercise of due diligence), the court infers reckless indifference to the interests of unsecured creditors. *Morton Thiokol*, 1990 WL 42607, at *12. Moreover, in deciding a Rule 12(b)(6) motion the court should not weigh competing inferences in deciding the plausibility of well-plead facts, unless one inference is so strong as to constitute an obvious alterative explanation. *Marcus & Millichap Co.*, 751 F.3d

at 996.  In light of actions specifically contrary to the corporate best interests that benefitted the Taggarts personally, the court will not find the existence of an obvious alternative explanation.

Husted's second theory is that the Taggarts' breached their duty of loyalty by attempting to improve their position as equity holders vis-à-vis unsecured creditors.  In this instance, unsecured creditors were harmed by decreasing the availability of unencumbered assets available to pay unsecured creditors, Emergency Ex Parte Mot. for Order Authorizing Post-Petition Financing 2:28-4:6, *In re ECS Refining*, Inc., No. 2018-22453 (Bankr. E.D. Cal. April 24, 2018), ECF No. 12, and by increasing the pool of unsecured creditors by $21.69 million, 11 U.S.C. § 506(a), (d).

Butch and Sundance, LLC's lien survives dismissal of the case. 11 U.S.C. § 349(b); *see also*, *Production Credit Ass'n of the Midlands v. Farm & Town Indus., Inc.*, 518 N.W.2d 339, 343 (Iowa 1994).  It also survives conversion to Chapter 7 and is not assailable by the Chapter 7 trustee.  11 U.S.C. §§ 348(d), 364(c), (e), 549(a) (limiting the trustee's ability to attack post-petition transactions); *Cf. Sapir v. C.P.Q. Colorchrome Corp. (In re Photo Promotion Assoc., Inc.)*, 881 F.2d 6, 8 (2nd Cir. 1989) (trustee entitled to recover under § 549(a) funds paid by the debtor to a trade creditor where § 364(c) authorization not obtained); *Terry Oilfield Supply Co., Inc. v. American Security Bank, N.A.*, 195 B.R. 66, 72 (S.D. TX 1996) (exception transactions approved under §§ 303(f) and 542(c), post-petition transactions approved by the court are not subject to §549(a) avoidance).  It also gave Butch & Sundance, LLC, a better right to ECS's assets, at least to the extent of the lien.  *Hartford Underwriters Ins. Co. v. Union Planters Bank, N.A.*, 530 U.S. 1, 4-5

(2000) (wholly encumbered assets may not be used to pay administrative claims); *In re KVN Corp.*, Inc., 514 BR 1, 5-6 (9th Cir. BAP 2014) (fully encumbered assets should be abandoned); *In re Traverse*, 753 F.3d 19, 25-26 (1st Cir. 2014). If the case did not dismiss or convert but continued in Chapter 11 it reduced the minimum amount due unsecured creditors. 11 U.S.C. § 1129(a)(7)(A)(ii) (best interests test).

Moreover, if the Chapter 11 continued to contested plan confirmation the Taggarts' actions have increased their ability to cramdown the plan at the expense of unsecured creditors. The primary impediment to nonconsensual plan confirmation is the absolute priority rule. *Northern Pac. R.R. Co. v. Boyd*, 228 U.S. 482, 504 (1913); *Caplin v. Marine Midland Grace Trust Co. of New York*, 406, U.S. 416, 436 fn. 2 (1972) (Douglas, J. dissenting). It is codified at 11 U.S.C. § 1129(b) and provides that the court may confirm a plan over objection of a creditor if "the plan does not discriminate unfairly, and is fair and equitable, with respect to each class of claims or interests that is impaired under, and has not accepted, the plan." "[D]iscriminate unfairly" is a "horizontal comparative assessment" that determines whether other similarly situated creditors are inappropriately advantaged vis-à-vis the nonaccepting class; "fair and equitable" is a vertical measurement that "regulates priority among classes of creditors having higher and lower priority for payment. *In re Tribune Co.*, 972 F.3d 228, 232 (3d Cir. 2020), quoting Bruce A. Markell, *A New Perspective on Unfair Discrimination in Chapter 11*, 72 Am. Bankr. L.J. 227, 227-28 (1998). Fair and equitable means that all senior classes of creditors, e.g., unsecured creditors, must be paid in full before any junior class may receive or retain any property

under the plan. *Norwest Bank Worthington v. Ahlers*, 485 U.S. 197, 202 (1988); *Carson Nugget, Inc. v. Green (In re Green)*, 98 B.R. 981, 982 (9th Cir. BAP 1989).

The "new value" rule is an exception to the absolute priority rule. It allows equity holders to retain their interest to the extent that they contribute new value to the estate, even though senior classes are not paid in full. *In re Bonner Mall P'ship*, 2 F.3d 899, 906 (9th Cir. 1993), *abrogated on other grounds* by *Bullard v. Blue Hills* Bank, 575 U.S. 496 (2015); *In re Coltex Loop Central Three Partners, L.P.*, 138 F.3d 39, 46 (2nd Cir. 1998)); *In re U.S. Truck Co., Inc.*, 800 F.2d 581, 588, 590 (6th Cir. 1986). The new value contributed must be reasonably equivalent to the interest received or the property retained. *In re Ambanc La Mesa Ltd. P'ship*, 115 F.3d 650, 654-656 (9th Cir. 1997). That value, in this case ECS's stock, is generally determined by the "going concern" value, *Consolidated Rock Products Co. v. Du Bois*, 312 U.S. 510, 525-26 (1941), and is based on the estimated future earnings discounted to present value. *In re Muskegon Motor Specialties*, 366 F.2d 522, 525 (6th Cir. 1966). The simple point is that reducing pre-petition earnings and profitability, even in the few months before filing, will reduce the new value payment necessary to force non-consensual plan confirmation.

These facts give rise to an inference that the Taggarts intentionally sought to advance a purpose other than the best interests of "all residual claimants, a category which now includes creditors". *Quadrant Structed Products Co., Ltd. v. Vertin* 115 A.3d at 546-47. As a result, trustee Husted has stated a plausible claim for breach of fiduciary duty, i.e., due care and loyalty.

### 4.  Full protection Under 8 Delaware Code § 141(e)

Delaware law provides directors who rely on appropriate professional advice a safe harbor.

> A member of the board of directors, or a member of any committee designated by the board of directors, shall, in the performance of such member's duties, be fully protected in *relying in good faith* upon the records of the corporation and *upon such information, opinions, reports or statements* presented to the corporation by any of the corporation's officers or employees, or committees of the board of directors, or by any other person *as to matters the member reasonably believes are within such other person's professional or expert competence and who has been selected with reasonable care by or on behalf of the corporation.*

8 Del. C. § 141(e) (emphasis added).

As a rule, the protections of § 141(e) are an affirmative defense. *Manzo v. Rite Aid Corp.*, 2002 WL 31926606, at *3 n. 7 (Del. Ch. Dec. 19, 2002); *Ogus v. SportTechie*, Inc., 2020 WL 502996, at *14 (Del. Ch. January 31, 2020). Generally, an affirmative defense cannot be raised by a Rule 12(b)(6) motion. *Xechem, Inc. v. Bristol-Myers Squibb Co.*, 372 F.3d 899, 901 (7th Cir. 2004). But where the allegations of the complaint disclose a bar to the action, i.e., affirmative defense, the issue may be raised by motion. *Weisbuch v. County of Los Angeles*, 119 F.3d 778, 783 fn. 1 (9th Cir. 1997); *Hensley Mfg. v. ProPride, Inc.*, 579 F.3d 603, 613 (6th Cir. 2009); *see also*, *Brehm v. Eisner*, 746 A.2d 244, 262 (Del. 2000) (applying the rule to 8 Del. C. § 141(e)).

Here, the facts give rise to an inference that Taggarts' actions fall outside the scope of § 141(e). At least an inference of the lack of good faith reliance exists. First Am. Compl. 14:22-27 ("a great way to put the screws to [SummitBridge]"), 16:13-16 (cessation of operations). The complaint contains no allegations that the

Professional Advisors were "selected with reasonable care."  Nor is there indication that the Professional Advisors were acting "by or on behalf of the corporation," as opposed to Taggarts personally.  As a result, § 141(e) is not a basis to dismiss the First Amended Complaint.

> **5.   Exculpatory clauses in the Certificate of Incorporation**

Delaware law allows a corporation's Certificate of Incorporation to exculpate directors from a broad spectrum of liabilities.

> In addition to the matters required to be set forth in the certificate of incorporation by subsection (a) of this section, the certificate of incorporation may also contain any or all of the following matters:
>
> ...
>
> A provision *eliminating or limiting the personal liability of a director* to the corporation or its stockholders for monetary damages for *breach of fiduciary duty* as a director, provided that such provision shall *not eliminate or limit the liability* of a director: (i) For any *breach of the director's duty of loyalty* to the corporation or its stockholders; (ii) *for acts or omissions not in good faith* or which involve intentional misconduct or a knowing violation of law; (iii) under § 174 of this title; or *(iv) for any transaction from which the director derived an improper personal benefit.*

Del. Code Ann. tit. 8, § 102(b)(7) (2020) (emphasis added).

ECS's Certificate of Incorporation provides:

> To the fullest extent permitted by the [General Corporation Law of Delaware] as the same exists or may hereafter be amended, a director of this Corporation shall not be personally liable to the Corporation or its stockholders for money damages for breach of fiduciary duty as a director, provided that this Article shall not eliminate or limit the liability of a director for (i) any breach of the director's duty of loyalty to the Corporation or its stockholders; (ii) acts or omissions not in good faith or which involve intentional misconduct or a knowing violation of the law, (iii) under section 174 of the [General Corporation Law of Delaware], or (iv) for any transaction from which the director derived an improper personal

benefit.

Certificate of Incorporation, Ninth Article.[8]

Plaintiff Husted's First Amended Complaint pleads plausible claims for (1) breach of the duty of due care, i.e., bad faith deepening insolvency; and (2) breach of the duty of loyalty, i.e., self-dealing arising from Taggarts' efforts to better their personal interest in the Chapter 11 process at the expense of creditors.  For the purposes of pleading, the former falls within the lack of good faith and/or improper personal benefit exceptions, § 102(b)(7)(ii),(iv); the latter is excepted as under the duty of loyalty exception, § 1207(b)(7)(ii).

As to the first count, the motion will be denied.

**B.    Second Cause of Action: Corporate Waste**

Plaintiff Husted alleges that "[t]he excessive [insider] commercial leases...unjustifiably high-cost payroll, and management decisions leading to cash consumption, inventory segregation, and the suspension of processing inventory" gives rise to a cause of action for corporate waste against the Taggarts.  First Am. Compl. 25:12-17.

Like actions against directors for breach of fiduciary duty, actions for waste are governed by the internal affairs doctrine and the law of the state of incorporation provides the rule of decision. *In re Verisign, Inc., Derivative Litig.*, 531 F. Supp. 2d 1173, 1215 (N.D. Cal. 2007) (finding claims for waste as implicating the Internal Affairs Doctrine); *Symington v. Guillen*, No. LACV1509809JAKPJWX, 2016 WL 7486603, at *8 (C.D. Cal. June 30, 2016).  As a result, Delaware

---

[8] For the purposes of this motion the court assumes that ECS's Certificate of Incorporation is a document incorporated by reference in the complaint.  *United States v. Ritchie*, 342 F.3d 903, 908 (9th Cir. 2003).

law provides the rule of decision.

Moreover, in limited circumstances, Delaware law does recognize a cause of action for corporate waste.  Any action for waste will lie where the plaintiff proves "that the exchange was 'so one sided that no [businessperson] of ordinary, sound judgment could conclude that the corporation has received adequate consideration." *In re Walt Disney Co. Derivative Litig.*, 906 A.2d 27, 74 (Del. 2006).  Waste will only be found in the "rare, 'unconscionable case where directors irrationally squander or give away corporate assets." *Id.*  This onerous standard for waste is a corollary of the proposition that where business judgment presumptions are applicable, the board's decision will be upheld unless it cannot be "attributed to any rational business purpose." *Id.*

Moreover, Delaware courts have thoughtfully defined the contours of corporate waste:

> Roughly, a waste entails an exchange of corporate assets for consideration so disproportionately small as to lie beyond the range at which any reasonable person might be willing to trade. Most often the claim is associated with a transfer of corporate assets that serves no corporate purpose; or for which no consideration at all is received. Such a transfer is in effect a gift. *If, however, there is any substantial consideration received by the corporation, and if there is a good faith judgment that in the circumstances the transaction is worthwhile, there should be no finding of waste*, even if the fact finder would conclude ex post that the transaction was unreasonably risky....

*Brehm v. Eisner*, 746 A.2d 244, 263 (Del. 2000) (emphasis added).

As the Supreme Court of Delaware has articulated the doctrine of waste, "a corporate waste claim must fail if 'there is any substantial consideration received by the corporation and...there is a good faith judgment that in the circumstances the transaction is worthwhile'." *White v. Panic*, 783 A.2d 543, 554 (Del. 2001).  Substantial

consideration and good faith must each exist to bring the directors'
actions within the business judgment rule and, therefore, bar an
action for waste.  *Id.*

Plaintiff Husted has stated a plausible claim for waste.  The
absence of substantial consideration received by the corporation and
the lack of good faith may form the basis of an action for waste.  The
allegations of intentional weakening and self-dealing, i.e., Butch and
Sundance, LLC, loan sans full disclosure properly make plausible a
finding of lack of substantial consideration and/or lack of good
faith.  As a result, the three part scheme aimed at SummitBridge also
provides sufficient inferences to support an action for waste,
sufficient to defeat a Rule 12(b)(6) motion.

As to the second count, the motion will be denied.

**C.    Third Cause of Action: Preferential Transfers**

Plaintiff Husted asserts a preference action against All Metals,
Inc.

Preferential transfers exist as creatures of statute:

Except as provided in subsections (c) and (i) of this
section, the trustee may, *based on reasonable due diligence
in the circumstances of the case and taking into account a
party's known or reasonably knowable affirmative defenses
under subsection (c),* avoid any transfer of an interest of
the debtor in property—-

(1) to or for the benefit of a creditor;

(2) for or on account of *an antecedent debt* owed by the
debtor before such transfer was made;

(3) made while the debtor was insolvent;

(4) made--

(A) on or within 90 days before the date of the filing
of the petition; or

(B) between ninety days and one year before the date of
the filing of the petition, if such creditor at the

time of such transfer was an insider; and

(5) that enables such creditor to receive more than such creditor would receive if--

(A) the case were a case under chapter 7 of this title;

(B) the transfer had not been made; and

(C) such creditor received payment of such debt to the extent provided by the provisions of this title.

11 U.S.C. § 547(b) (emphasis added).

Plaintiff Husted's third count predominantly pleads legal conclusions.  But it does include the following facts: (1) All Metals, Inc., leased space to ECS "for its recycling operations," First Am. Compl. 5:1-4;[9] (2) All Metals, Inc., was an insider, *Id.*; (3) within one year before the bankruptcy ECS made payments to All Metals on account of "invoice[s]," *Id.* 26:11-16; and (4) those payments were made on the following dates and in the following amounts, (A) August 31, 2017-$400,000; (B) September 19, 2017-$300,000; and (C) November 28, 2017-$490,000.  Exhibits to First Am. Compl. 8, ECF No. 30.

### 1.  Due diligence

A conditions precedent is a "statutory prerequisite[] to litigation."  5 Arthur R. Miller et al., *Federal Practice and Procedure* § 1303 (4th ed.).  Section 547(b) now requires that the trustee satisfy a condition precedent, i.e., reasonable due diligence and consideration of known or knowable affirmative defenses.  Small Business Reorganization Act of 2019, Pub. L. No. 116-54 § 3(a), effective February 19, 2020.  "[T]he trustee may, based on reasonable due diligence in the circumstances of the case and taking into account a party's known or reasonably knowable affirmative defenses under

---

[9] The court cannot ascertain whether the payments were on account of rent, First Am. Compl. 26:5-7, 14-16, or goods and/or services rendered, *Id.* at 26:5-7.

subsection (c), avoid any transfer...."  11 U.S.C. § 547(b).  This condition precedent has three discrete subparts, which the trustee, or someone acting on her behalf, must undertake prior to the commencement of a preference action: (1) reasonable due diligence under "the circumstances of the case"; (2) consideration as to whether a prima facie case for a preference action may be stated; and (3) review of the known or "reasonably knowable" affirmative defenses that the prospective defendant may interpose.  11 U.S.C. § 547(b).

This court believes that this condition precedent, i.e., due diligence and consideration of affirmative defenses, is an element of the trustee's prima facie case.  11 U.S.C. § 547.  As a rule, conditions precedent, or the lack thereof, may defeat jurisdiction, *Henderson ex rel. Henderson v. Shinseki*, 562 U.S. 428, 436 (2011) (the failure of a condition precedent only deprives federal courts of jurisdiction where there is "clear indication that Congress wanted the rule to be jurisdictional"); *see also U.S. E.E.O.C. v. Farmers Ins. Co.*, 24 F.Supp.3d 956, 962-63 (E.D. Cal. 2014); serve as an element of the prima facie case, *Walton v. Nalco Chemical Co.*, 272 F.3d 13, 21 n. 11 (1st Cir. 2001) (conditions precedents that are elements are those that preclude a finding for the plaintiff); *U.S. ex rel. Krol v. Arch Ins. Co.*, 46 F.Supp.3d 347, 356 (S.D. NY 2014) (exhaustion of administrative remedies under Miller Act treated as an element); *Pacific Dental Services, LLC v. Homeland Ins. Co. of New York,* 2013 WL 3776337, *4 (C.D. Cal. 2013) (contract claim); or constitute an affirmative defense, *Albino v. Baca*, 747 F.3d 1162, 1168-69 (9th Cir. 2014).  The effect of § 547(b)'s due diligence requirement has not been resolved.  *Harker v. Cummings (In re GYPC, Inc.)*, 2020 Bankr. LEXIS 2384, *25 (Bankr. S.D. Ohio, August 4, 2020) (denying Rule

12(b)(6) motion without analysis); 5 *Collier on Bankruptcy* at ¶ 547.02A (describing due diligence as an element or a condition precedent).

    The Supreme Court has provided guidance in determining whether a condition precedent is an element or an affirmative defense.  In *Jones v. Bock*, 549 U.S. 199, 212-217 (2007), the court considered whether the prison grievance procedures contained in the Prison Litigation Reform Act of 1995 are "a pleading requirement the prisoner must satisfy in his complaint or an affirmative defense the defendant must plead and prove."  As the court explained, prison litigation "account[s] for an outsized share of filings in federal district courts."  Often, incarcerated persons bring actions under 42 U.S.C. § 1983 for wrongs, perceived or actual, arising from the conditions associated with their confinement.  In response, Congress enacted the Prison Reform Act of 1995.  42 U.S.C. § 1997e.  Among the reforms contained in that statute were mandatory early judicial screening of prisoner complaints and a requirement that incarcerated persons exhaust prison grievance procedures before filing suit.  The requirement of exhausting grievance procedures states:

> No action shall be brought with respect to prison conditions under section 1983 or any other Federal law, by a prisoner confined in any jail, prison or other correctional facility until such administrative remedies as are available are exhausted.

42 U.S.C. § 1997e(a).

    The Prison Reform Litigation Act also gave courts sua sponte powers to dismiss prisoner cases in some circumstances:

> The court shall *on its own motion* or on the motion of a party *dismiss any action* brought with respect to prison conditions under section 1983 of this title, or any other Federal law, by a prisoner confined in any jail, prison, or other correctional facility *if the court is satisfied that*

> *the action is frivolous, malicious, fails to state a claim*
> *upon which relief can be granted, or seeks monetary relief*
> *from a defendant who is immune from such relief.*

42 U.S.C. § 1997e(c)(1) (emphasis added).

As the Supreme Court articulated the issue before it:

> There is no question that exhaustion is mandatory under the
> [Prison Litigation Reform Act] and that unexhausted claims
> cannot be brought in court. *What is less clear is whether*
> *it falls to the prisoner to plead and demonstrate*
> *exhaustion in the complaint, or to the defendant to raise*
> *lack of exhaustion as an affirmative defense.*

*Jones*, 549 U.S. at 211 (emphasis added) (citations omitted).

A circuit split developed with respect to the pleading requirements

applicable to the Prison Litigation Reform Act.  The Sixth Circuit

"adopted several procedural rules designed to implement this

exhaustion requirement and facilitate early judicial screening.  These

rules require a prisoner to allege and demonstrate exhaustion in this

complaint...and require courts to dismiss the entire action" if

exhaustion had not been fully demonstrated in the complaint.  Other

circuits declined to adopt those rules and treated the failure to

exhaust prison grievances as an affirmative defense that must be

raised in the answer, Fed. R. Civ. P. 8(c).  The Supreme Court granted

certiorari.  In resolving the issue, the Supreme Court noted the

Prison Reform Act of 1995 was "silent on the issue whether exhaustion

must be pleaded by the plaintiff or is an affirmative defense."  In

deciding whether exhaustion of administrative remedies was, in fact,

an affirmative defense, the Supreme Court focused on three things.

First, it noted that "the [Prison Litigation Reform Act] itself is not

a source of a prisoner's claim; claims covered by the [Prison

Litigation Reform Act] are typically brought under 42 U.S.C. § 1983,

which does not require exhaustion at all."  Second, the parties to the

action did not dispute characterization of the grievance process as an affirmative defense.  Third, historically, exhaustion of administrative remedies has been regarded as an affirmative defense. Finally, the court observed,

> The [Prison Litigation Reform Act] dealt extensively with the subject of exhaustion, see 42 U.S.C. §§ 1997e(a), (c)(2), but is silent on the issue whether exhaustion must be pleaded by the plaintiff or is an affirmative defense. This is strong evidence that the usual practice should be followed, and the usual practice under the Federal Rules is to regard exhaustion as an affirmative defense.

*Jones*, 549 at 212.

Once the court concluded that exhaustion of administrative remedies was an affirmative defense, the Supreme Court had little difficulty in deciding that a prisoner need not plead satisfaction of the condition precedent to avoid the sua sponte dismissal provisions of the Prison Litigation Reform Act.  42 U.S.C. § 1997e(c).

*Jones* provides a roadmap for consideration of the Small Business Reorganization Act's amendments to § 547(b).  Like the Prison Litigation Reform Act, amended § 547(b) is silent on whether satisfaction of the condition precedent is an element or an affirmative defense and on whether satisfaction is a pleading requirement.

But that is where the Small Business Reorganization Act of 2019 amendments to § 547(b) and the Prison Litigation Reform Act of 1995 part company.  At least two significant differences exist.  First, § 547(b) is the source of the trustee's substantive rights.  It defines those transactions that the trustee may avoid as preferential. *Waldschmidt v. Ranier (In re Fulghum Construction Corp.)*, 706 F.2d 171 (6th Cir. 1983) ("[p]referential transfers which may be avoided by the trustee are defined in 11 U.S.C. § 547(b)..."); *Levit v. Ingersoll*

*Rand Financial Corp.*, 874 F.2d 1186, 1194 (7th Cir. 1989) ("[s]ection 547(b) defines which transfers are 'avoidable'"). When the legislature elects to define a term, that definition is binding on the courts. *Sturgeon v. Frost*, 139 S.Ct. 1066 (2019); *Digital Realty Trust, Inc. v. Somers*, 138 S.Ct. 767 (2018); *United States v. Ron Pair Enters., Inc.*, 489 U.S. 235, 242 (1989) (plain language of a statute controls). In contrast, the Prison Litigation Reform Act merely provided a procedural overlay to existing statutory rights, e.g., 42 U.S.C. § 1983, and applies to any action "with respect to prison conditions under section 1983 of this title, or any other Federal law." 42 U.S.C. § 1997e(a). In part, *Jones* based its holding on the fact that "[t]he [Prison Litigation Reform Act] itself is not a source of a prisoner's claims; claims covered by the [Prison Litigation Reform Act] are typically brought under 42 U.S.C. § 1983, which does not require exhaustion at all." *Jones*, 549 U.S. at 212. As a result, a legislative decision to include due diligence in the definition of avoidable preferences undercuts one of the central pillars articulated for the holding in *Jones*.

Second, unlike the Prison Litigation Reform Act (which is silent on the issue), § 547 expressly requires that the trustee affirmatively prove due diligence. Ordinarily, facts that the plaintiff must prove at trial are elements of the prima facie case. *Flav-O-Rich Food Service, Inc. v. Rawson Food Service, Inc. (In re Rawson Food Services Inc.)*, 846 F.2d 1343 (11th Cir. 1988) (construing 11 U.S.C. § 546(c)); *Nayab v. Capital One Bank (USA), N.A.*, 942 F.3d 480, 493 (9th Cir. 2019) ("who bears the ultimate burden of proof and/or persuasion is indicative of who bears the initial burden of pleading"); 5 Arthur R. Miller et al., *Federal Practice and Procedure* § 1271 n. 23 (3d ed.).

Simply put, if the plaintiff bears the burden of proof of the fact at trial, in most instances it is an element; if the defendant bears the burden of proof at trial it is probably an affirmative defense. Moreover, "[a] defense which demonstrates that plaintiff has not met its burden of proof is not an affirmative defense." *Zivkovic v. S. California Edison Co.*, 302 F.3d 1080, 1088 (9th Cir. 2002).

Here, § 547(b) defines avoidable preferences; in contrast § 547(c) offers preference defendants nine affirmative defenses with which they may resist the trustee's effort to recover the offending transfer. *Enserv Co., Inc. v. Manpower, Inc. (In re Enserv Co., Inc.)*, 64 B.R. 519, 521 (9th Cir. BAP 1986) (§ 547(c) is an exhaustive list of affirmative defenses), aff'd 813 F.2d 1230 Mar. 19, 1987); *Ju v. Liu (In re Liu)*, 611 B.R. 864, 880 (9th Cir. BAP 2020).

Congress has expressly allocated the burden of proof on the issue of due diligence under § 547(b) to the trustee.

> For the purposes of this section, *the trustee has the burden of proving the avoidability of a transfer under subsection (b) of this section*, and the creditor or party in interest against whom recovery or avoidance is sought has the burden of proving the nonavoidability of a transfer under subsection (c) of this section.

11 U.S.C. § 547(g) (emphasis added).

Finally, the court believes that treatment of the due diligence requirement as an element falls within the plain meaning rule. As a consequence, that meaning controls unless "the literal application of a statute will produce a result demonstrably at odds with the intentions of its drafters." *United States v. Ron Pair Enterprises, Inc.*, 489 U.S. 235, 242, (1989). That is not the case here. The Small Business Reorganization Act of 2019 made two changes to the preference actions by: (1) adding a "reasonable due diligence"

requirement, 11 U.S.C. § 547(b); and (2) expanding the venue protections for low dollar avoidance action defendants, 28 U.S.C. § 1409 (raising the dollar limit for actions that must be filed in the defendant's district of residence from $13,650 to $25,000). Legislative history does not explain the reason for these changes. But a fair reading of these amendments is that Congress sought to curb what it perceived as improper use of preference actions in some instances. 5 *Collier on Bankruptcy* ¶ 547.02A (Alan N. Resnick & Henry J. Sommer eds., 16th ed. 2020) (describing "preference mills," which are law firms employed on a contingent basis, who file adversary proceedings for small dollar actions in districts other than the defendant's residence with little--or no--evaluation of the merits, solely to force nuisance value settlements); *see also* American Bankruptcy Institute, *Commission to Study the Reform of Chapter 11*, 148-151 (2014), https://abiworld.app.box.com/s/vvircv5xv83aavl4dp4h (documenting preference action abuse, i.e., failure of merits consideration before commencement of an action, and recommending curative provisions, i.e., adding a due diligence requirement, increasing the dollar limitation contained in the home district venue provisions of 28 U.S.C. § 140(b), and requiring particularity in preference pleadings). This court believes that treatment of due diligence as an element of the prima facie case under § 547(b) is consistent, rather than at odds, with Congressional intent.

Moreover, where applicable substantive law treats a condition precedent as an element of the prima facie case, rather than an affirmative defense, it must be plead. Fed. R. Civ. P. 9(c), *incorporated by* Fed. R. Bankr. P. 7009; *Walton v. Nalco Chem. Co.*, 272 F.3d 13, 21 (1st Cir. 2001) ("Rule 9(c) governs not only contractual

conditions precedent, but statutory conditions precedent as well");

*Pacific Dental Services, LLC v. Homeland Insurance Co. of New York*,

2013 WL 3776337, *4 (C.D. Cal. 2013) (applying California substantive

law); *see also, Iqbal*, 556 U.S. at 679; *Twombly*, 550 U.S. at 556.

Even so, § 547(b) requires only "reasonable due diligence." The standard is an objective one and is defined by a competent trustee practicing before the specific jurisdiction involved. *See In re Kayne*, 453 B.R. 372, 382 (9th Cir. 2011) (sanctioning attorney under Fed. R. Bankr. 9011 for failing to perform due diligence), citing *Smyth v. City of Oakland (In re Brooks-Hamilton)*, 329 B.R. 270, 283 (9th Cir. BAP 2005) (quoting *In re Grantham Bros.*, 922 F.2d 1438, 1441 (9th Cir.1991)), *aff'd in part and rev'd in part on other grounds*, 271 Fed. Appx. 654, 656 (9th Cir.2008).

Here, the plaintiff is the duly appointed Chapter 7 trustee. She was appointed 18 months prior to the commencement of this adversary proceeding. Absent allegations in the complaint suggesting otherwise, post-petition she is deemed the custodian of ECS's regularly kept records, 11 U.S.C. §§ 323, 541, 542, and she is fairly charged with the knowledge of the facts that those records would reveal. The First Amended Complaint does not expressly recite the efforts she undertook to evaluate the merits of a prima facie case or reasonably knowable affirmative defenses. Plaintiff Husted's use of pre-*Iqal*/*Twombly* notice style pleadings and a very general nature of the allegations in the First Amended Complaint suggest a lack of pre-filing due diligence. Reasonable inferences do not suggest that trustee Husted considered whether the debt was antecedent, 11 U.S.C. § 547(b)(2); whether those transfers improved defendant's position, 11 U.S.C. § 547(b)(5), *Elliott v. Frontier Properties (In re Shurtleff, Inc.)*, 778

45

F.2d 1416, 1421 (9th Cir. 1985) (existing as a matter of law unless case solvent); nor the inapplicability of all affirmative defenses, known or reasonably knowable.  11 U.S.C. § 547(c).

**2.   Antecedent debt**

Preference actions require payment on account of an antecedent debt.  11 U.S.C.§ 547(b)(2).  An antecedent debt is one owed before the transfer is actually made.  *Id.*  A debt is owed when one is obligated by law to pay it.  *Nolen v. Van Dyke Seed Co., Inc. (In re Gold Coast Seed Co.)*, 751 F.2d 1118, 1119 (9th Cir. 1985).

The First Amended Complaint is unclear whether the payment was on account of rent for commercial space or for goods provided and/or services rendered.  First Am. Compl. 26:5-7 ("goods, services and/or commercial space"); *see also*, Exhibits to First Am. Compl. 8, ECF No. 30 (describing "[p]ayment of invoice").  Because the Insider Entity Defendants have argued that the payment was for rent and because the trustee has not resisted that characterization, the court assumes that the disputed payments were for commercial space rent.

Current rent payments are not on account of an antecedent debt; late rent payments are on account of an antecedent debt.  *In re Upstairs Gallery, Inc.*, 167 B.R. 915, 918 (9th Cir. BAP 1994); *In re Coco*, 67 B.R. 365, 371 (Bankr. S.D. NY 1986); *In re Garrett Tool & Engineering, Inc.*, 273 B.R. 123, 126 (E.D. MI 2002); Cf. *In re Tanner Family, LLC*, 556 F.3d 1194, 1197 & n. 2 (11th Cir. 2009) (lease termination payment due when lease executed).

Here, there is no principled manner by which this court may independently determine whether these three payments were made after they were due.  The complaint plead only a legal conclusion, "Rents were made after they had come due...").  First Am. Compl. 26:11-16.

### 3.   Ordinary course defense

Trustee Husted's action is not barred by the ordinary course affirmative defense.  11 U.S.C. § 547(c)(2); *Enserv Co., Inc. v. Manpower, Inc. (In re Enserv Co., Inc)*, 64 B.R. 519, 521 (9th Cir. BAP 1986), *aff'd.* 813 F.2d 1230 (9th Cir. Mar. 19, 1987); *Jue v. Liu (In re Liu)*, 611 B.R. 864, 880 (9th Cir. BAP 2020).  Section 547(c)(2) provides:

> The trustee may not avoid under this section a transfer--
>
> ...
>
> (2) to the extent that such transfer was in payment of a debt incurred by the debtor in the ordinary course of business or financial affairs of the debtor and the transferee, and such transfer was--
>
> (A) *made in the ordinary course of business or financial affairs of the debtor and the transferee*; or
>
> (B) *made according to ordinary business terms*.

11 U.S.C. § 547(c)(2) (emphasis added).

Since it is an affirmative defense, the plaintiff need not plead around it and a Rule 12(b)(6) motion will lie only if the facts of the transaction show that the payment was, in fact, made in the ordinary course of "business or financial affairs of the debtor and the transferee" or "according to ordinary business terms."  11 U.S.C. § 547(c)(2).  Here, the irregular payment dates, i.e., August 31, September 29, and November 28, 2017, and varying amounts of payment, i.e., $400,000, $300,000, and $490,000, do not reflect a bar to the action and are sufficient to defeat, at least for pleading purposes, an ordinary course defense.

As to the third count, the motion will be granted.

### D.   Fourth Cause of Action: Fraudulent Transfers (Actual)

Trustee Husted alleges that rental payments made to the Insider

Entity Defendants for rent for the Stockton Facility, Mesquite Facility, and other rented facilities within one year before the Chapter 11 filing constituted actual fraud. First Am. Compl. 27:3-28:19; 75-177; Exhibits to First Am. Compl. 2-8, ECF No. 30.

A trustee may avoid a transfer for a debt incurred within two years prior to the bankruptcy if the debtor "made such transfer or incurred such obligation with actual intent to hinder, delay, or defraud any entity to which the debtor was or became, on or after the date that such transfer was made or such obligation was incurred, indebted..." 11 U.S.C. § 548(a)(1).

Ordinarily the intent element of fraud is demonstrated by circumstantial evidence. The Ninth Circuit has provided clear guidance on this subject:

> Among the more common circumstantial indicia of fraudulent intent at the time of the transfer are: (1) actual or threatened litigation against the debtor; (2) a purported transfer of all or substantially all of the debtor's property; (3) insolvency or other unmanageable indebtedness on the part of the debtor; (4) a special relationship between the debtor and the transferee; and, after the transfer, (5) retention by the debtor of the property involved in the putative transfer.

> The presence of a single badge of fraud may spur mere suspicion; the confluence of several can constitute conclusive evidence of actual intent to defraud, absent "significantly clear" evidence of a legitimate supervening purpose.

*In re Acequia, Inc.*, 34 F.3d 800, 805-06 (9th Cir. 1994).

As is the case here, Rule 12(b)(6) motions frequently target the sufficiency of the pleadings as to the defendant's intent to hinder, delay or defraud creditors.

At least for the purposes of defeating a Rule 12(b)(6) motion, plaintiff Husted has plead facts giving rise to at least two indicia of fraud. The existence of unmanageable debt, *Acequia*, 34 F.3d at

805-06, is sufficiently plead by the retention of MCA Financial Group, Ltd., as its financial advisor, and Snell & Wilmer, a national insolvency firm, as its legal advisors, as well as its negotiation of a forbearance agreement through December 31, 2017, and efforts to restructure its debt. First Am. Compl. 10:24-11:5, 11:21-12:17. The special relationship between the Insider Entity Defendants and ECS, *Acequia*, 34 F.3d at 805-06, has been sufficiently plead. First Am. Compl. 4:4-5:4, 6:15-20. Moreover, plaintiff Husted has plead facts giving rise to the inference if an improper purpose, e.g., self-dealing, may be inferred. *Id.* ("absent 'significantly clear' evidence of a legitimate supervening purpose").

As to the fourth count, the motion will be denied.

**E.    Fifth Cause of Action: Fraudulent Transfers (Constructive)**

Husted alleges that prepayment for "goods and/or services subsequently received" gives rise to a cause of action for constructive fraudulent transfer. First Am. Compl. 28:25-28.

Constructive fraud is defined by statute.

> (a)(1) The trustee may avoid any transfer... of an interest of the debtor in property, or any obligation... incurred by the debtor, that was made or incurred on or within 2 years before the date of the filing of the petition, if the debtor voluntarily or involuntarily—
>
> ...
>
> (B) (i) *received less than a reasonably equivalent value in exchange for such transfer or obligation;* and
>
> > (ii)(I) was insolvent on the date that such transfer was made or such obligation was incurred, or became insolvent as a result of such transfer or obligation;
> >
> > (II) was engaged in business or a transaction, or was about to engage in business or a transaction, for which any property remaining with the debtor was an unreasonably small capital;
> >
> > (III) intended to incur, or believed that the debtor

49

would incur, debts that would be beyond the debtor's
ability to pay as such debts matured...

11 U.S.C. § 548(a)(1)(B) (emphasis added).

To plead a viable cause of action for constructive fraud the
plaintiff must plead:

> To plead plausible constructive fraudulent transfer claims
> against Defendants, Trustee had to allege facts to support
> the following four elements: (1) a transfer of [debtor's]
> interest in property; (2) the transfer was made or incurred
> within two years before the date of the bankruptcy
> petition; (3) *[debtor] received less than reasonably
> equivalent value in exchange for the transfer*; and (4) one
> of three alternatives:
>
> (I) that [the debtor] was insolvent on the date the
> transfer was made or became insolvent as a result of the
> transfer;
>
> (ii) that [the debtor] was engaged in business for which
> any property remaining was an unreasonably small capital;
> or
>
> (iii) that [the debtor] intended to incur or believed it
> would incur debts beyond its ability to pay as such debts
> matured.

*In re Blue Earth, Inc.*, No. 3:16-BK-30296-DM, 2019 WL 4929933, at *6
(9th Cir. BAP Oct. 2, 2019), *appeal docketed*, No. 19-60054 (9th Cir.
October 30, 2019) (emphasis added).

Here, after incorporating by reference the preceding 181
paragraphs, Trustee Husted alleges constructive fraudulent transfers
with respect to the Insider Entity Defendants arising out of (A) 24
payments to Sinclair Partners, LLC, characterized as "rent"
aggregating $1.473 million; (B) 27 payments to ECS Big Town, LLC,
called "rent" aggregating $551,737; and (C) 3 payments to All Metals,
Inc., denominated "payment of invoice" aggregating $1.190 million.
First Am. Compl. 25:27-26:2; Exhibits to First Amend Compl. 8, ECF No.
30.  The complaint then alleges:

> *To the extent one or more of the Transfers identified on*

*Exhibit A were not made on account of an antecedent debt, [and] was a prepayment for goods or services subsequently received,* Plaintiff pleads that the debtor did not receive *reasonably equivalent value* in exchange for such transfer(s) and:

a) Debtor was insolvent as of the date of the Transfers or became insolvent as a result of the Transfers; or

b) The Debtor was engaged in, or about to engage in business or a transaction for which any property remaining with the Debtors or for whose benefit the Transfer was made was an unreasonably small capital; or

c) the Debtor intended to incur, or believed it would incur, debts beyond their ability to pay upon maturity.

First Am. Compl. 28:25-29:7 (emphasis added).

Plaintiff Husted has not plead facts from which the court can plausibly find that ECS did not receive "reasonably equivalent value." Recitation of the statutory elements of a cause of action is insufficient. *Id.* At a bare minimum, the complaint must "describe the consideration and why the value of such consideration was less than the amount transferred." *Sarachek v. The Right Place, Inc. (In re Agriprocessors), Inc.*, No. Adv 10-09123, 2011 WL 4621741, at *6 (Bankr. N.D. Iowa Sept. 30, 2011); *Angel v. Ber Care Inc. (In re Caremerica), Inc.*, 409 B.R. 737, 756 (Bankr. E.D.N.C. 2009).

Here, the complaint falls short of the standards articulated in *Iqbal* and *Twombly*. Paraphrased, the complaint is fairly read to state that if the payments were not rent and if they were prepayment for goods or services they are not of reasonably equivalent value. First Am. Compl. 28:25-29:7. The First Amended Complaint makes no effort to describe the consideration (or in the alternative, state that no consideration was received) or to explain why the consideration received was less than the amount transferred.

As to the fifth count, the motion will be granted.

**F.    Seventh Cause of Action: Recovery of Avoided Transfers**

Plaintiff Husted's seventh cause of action seeks to recover transactions avoided under 11 U.S.C. §§ 547, 548 and 549, i.e., the third, fourth, fifth and sixth cause of action. 11 U.S.C. § 550(a). Since § 550 recovery is dependent on the trustee prevailing on the underlying cause of action and since this motion will be granted as to the third, fifth and sixth causes of action, the motion will also be granted as to those causes of action insofar as they are contained in the seventh cause of action, and otherwise denied.

**G.    Leave to Amend**

Federal Rule of Civil Procedure 15(a) provides that leave to amend "shall be freely given when justice so requires." Circuit law is well settled on this point.  "In determining whether to grant leave to amend the court should consider five factors: bad faith, undue delay, prejudice, futility, and previous amendments. *Johnson v. Buckley*, 356 F.3d 1067, 1077 (9th Cir. 2004). "Futility alone can justify" denying leave to amend. *Nunes v. Ashcroft*, 375 F.3d 805, 808 (9th Cir. 2004)." *Aluisi v. Jorgensen (In re Jorgensen)*, No. 18-14586-A-13, 2019 WL 6720418, at *9 (Bankr. E.D. Cal. Dec. 10, 2019).

Bad faith, undue delay and prejudice are not present here. Except as otherwise provided herein, this court believes that plaintiff Husted may be able to cure the pleading deficiencies and will grant leave to file a Second Amended Complaint.

\
\
\
\
\

**VI.    CONCLUSION**

　　For each of these reasons, the motions will be granted and denied as provided herein.  The court will issue an order from chambers.

**Dated:** December 15, 2020

_Fredrick E. Clement_
Fredrick E. Clement
United States Bankruptcy Judge

# Instructions to Clerk of Court

### Service List - Not Part of Order/Judgment

**The Clerk of Court is instructed to** send the Order/Judgment or other court generated document transmitted herewith *to the parties below*. The Clerk of Court will send the document via the BNC or, if checked _____, via the U.S. mail.

| Attorney for the Plaintiff(s) | Attorneys for the Defendant(s) |
|---|---|
| **Bankruptcy Trustee** (if appointed in the case) | **Office of the U.S. Trustee**<br>Robert T. Matsui United States Courthouse<br>501 I Street, Room 7-500<br>Sacramento, CA  95814 |